UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

CHERYL A. GARTNER,                          CIVIL NO. 06-1383 (JRT/JSM)

     Plaintiff,

v.                                          <u>REPORT AND RECOMMENDATION</u>

MICHAEL J. ASTRUE,
Commissioner of Social Security,

     Defendant.

JANIE S. MAYERON, United States Magistrate Judge

## I.   <u>INTRODUCTION</u>

The above matter is before the undersigned United States Magistrate Judge on plaintiff's Motion for Summary Judgment [Docket No. 16] and defendant's Motion for Summary Judgment [Docket No. 20].  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

For the reasons discussed below, it is recommended that plaintiff's Motion for Summary Judgment [Docket No. 16] be denied, and defendant's Motion for Summary Judgment [Docket No. 20] be granted.

## II.   <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

Plaintiff applied for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416, 423, on October 11, 2001.  (Tr. 137-39).  Plaintiff alleges a complete inability to work, starting June 29, 2000, due to arthritis in her knees, neck, back, and hands, and depression.  (Tr. 137-39, 155).

The Social Security Administration ("SSA") denied plaintiff's application initially and upon reconsideration.  (Tr. 46-51).  Plaintiff then filed a request for a hearing, and on September 27, 2002, a hearing was held before Administrative Law Judge ("ALJ") James D. Geyer.  (Tr. 127).  On November 27, 2002, the ALJ issued a decision denying plaintiff benefits.  (Tr. 67).  Plaintiff requested review from the Appeals Council.  (Tr. 98-105).  On February 12, 2005, the Appeals Council found that the record was incomplete because the hearing tape could not be located.  (Tr. 127).  On remand, the Appeals Council directed the ALJ to:

- Obtain additional evidence concerning the claimant's impairments in order to complete and update the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 CFR 404.1512-1513).  The additional evidence will include, if available, a consultative orthopedic examination and medical source statements about what the claimant can still do despite the impairments.

- Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations (Social Security ruling 96-8p).  In so doing, evaluate the treating and examining source opinions pursuant to the provisions of 20 CFR 404.1527 and Social Security rulings 96-2p and 96-5p and nonexamining source opinions in accordance with the provisions of 20 CFR 404.1527(f) and Social Security Ruling 96-6p, and explain the weight given to such opinion evidence.  As appropriate, the Administrative Law Judge may request the treating and examining sources to provide additional and/or further clarification of the opinions and medical source statements about what the claimant can still do despite the impairments (20 CFR 404.1512).

- Obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Rulings 83-14 and 96-6p).  The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole.  The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404.1566).  Further, before relying on the vocational expert

evidence the Administrative Law Judge will identify and resolve any conflicts between Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

(Tr. 127-28).

Following remand, a second hearing was held before the ALJ on May 20, 2005. (Tr. 471-521).  On August 25, 2005, the ALJ issued a decision denying plaintiff benefits. (Tr. 16-36).  Plaintiff requested review from the Appeals Council.  (Tr. 11-12).  On February 23, 2006, the Appeals Council denied her request.  (Tr. 7-9).  Denial of review by the Appeals Council thus made the ALJ's decision the final decision of the Commissioner in this case.  See 42 U.S.C. § 405(g).

Plaintiff sought review of the ALJ's decision by filing a Complaint with this Court pursuant to 42 U.S.C. § 405(g).  [Docket No. 1].  The parties now appear before the Court on plaintiff's Motion for Summary Judgment [Docket No. 16] and defendant's Motion for Summary Judgment [Docket No. 20].

## III.  PROCESS FOR REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability."  42 U.S.C. § 1382(a); Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992).  The Social Security Administration shall find a person disabled if the claimant "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 1382c(a)(3)(A).  The claimant's impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C.

3

§ 1382c(a)(3)(B).   The impairment must last for a continuous period of at least 12 months or be expected to result in death.   42 U.S.C. § 1382c(a)(3)(A); <u>see also</u> 20 C.F.R. §§ 404.1509, 416.909.

### A.   Administrative Law Judge Hearing's Five-Step Analysis

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision.   20 C.F.R. §§ 404.909(a)(1), 416.1409(a).   A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ.   42 U.S.C. §§ 405(b)(1), 1383 (c)(1); 20 C.F.R. §§ 404.929, 416.1429, 422.201 <u>et seq</u>.   To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity, past work, age, education and work experience.   <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; <u>see also</u> <u>Locher</u>, 968 F.2d at 727.   The Eighth Circuit described this five-step process in <u>Morse v. Shalala</u>:

> The first step asks if the claimant is currently engaged in substantial gainful employment.   If so, the claimant is not disabled.   If not, the second step inquires if the claimant has an impairment or combination of impairments that significantly limits the ability to do basic work activities.   If not, the claimant is not disabled.   If so, the third step is whether the impairments meet or equal a listed impairment; if they do, the claimant is disabled.   The fourth step asks if the claimant's impairments prevent [him] from doing past relevant work.   If the claimant can perform past relevant work, [he] is not disabled.   The fifth step involves the question of whether the claimant's impairments prevent [him] from doing other work.   If so, the claimant is disabled.

16 F.3d 865, 871 (8th Cir. 1994).

**B.      Appeals Council Review**

If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic.  20 C.F.R. §§ 404.967-404.982, 416.1467-416.1492.  The decision of the Appeals Council (or of the ALJ, if the request for review is denied) is final and binding upon the claimant unless the matter is appealed to Federal District Court within 60 days after notice of the Appeals Council's action.  42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

**C.      Judicial Review**

Judicial review of the administrative decision generally proceeds by considering the decision of the ALJ at each of the five steps.  The Court is required to review the administrative record as a whole and to consider:

1.      The credibility findings made by the ALJ.

2.      The plaintiff's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The plaintiff's subjective complaints relating to exceptional and non-exertional activities and impairments.

5.      Any corroboration by third parties of plaintiff's impairments.

6.      The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth plaintiff's impairments.

Cruse v. Bowen, 867 F.2d 1183, 1885 (8th Cir. 1989 (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

The review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole.   42 U.S.C. § 405(g); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison v. NLRB, 305 U.S. 197, 229 (1938)); see also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994).   "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings."  Gavin v. Heckler, 811 F.2d 1195, 1999 (8th Cir. 1987). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis."  Id.  In reviewing the administrative decision, "'[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" Id. (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact.  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence.   Culbertson, 30 F.3d at 939.   The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding).   Instead, the Court must consider "the weight of the

evidence in the record and apply a balancing test to evidence which is contradictory." Gavin, 811 F.2d at 1199.

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act.   See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991).   Once the claimant has demonstrated he or she cannot perform prior work due to a disability, the burden of proof then shifts to the Commissioner to show that the claimant can engage in some other substantial, gainful activity.   Cox v. Apfel, 160 F.3d 1203, 1206 (8th Cir. 1998); Martonik v. Heckler, 773 F.2d 236, 238 (8th Cir. 1985).

## IV.   DECISION UNDER REVIEW

### A.   The ALJ's Findings of Fact

Plaintiff was born on January 14, 1957, and was 48 years old on the date of the ALJ's decision.   (Tr. 17, 36).   Plaintiff has high school education through a general equivalency diploma.   (Tr. 17).   Plaintiff has past relevant work experience as a caregiver, custodian, food preparer, baby-sitter, caretaker and recorder.   (Tr. 17). Plaintiff alleges that she became disabled starting June 29, 2000.  (Tr. 17).

The ALJ concluded that plaintiff was not entitled to Disability Insurance Benefits or under sections 216(i) and 223 of the Social Security Act.  (Tr. 35-36).  The ALJ stated that he made the following findings based on the entire record:

1.   The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits at least through the date of this decision.

2.   The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.      The claimant's degenerative joint disease of the left knee, degenerative disc disease of the cervical and lumbosacral spine, fibromyalgia, osteoarthritis of the hand and right knee, and depressive disorder are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).

4.      These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.      The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.      The claimant retains the residual functional capacity to perform sedentary exertional work within the following parameters: claimant can lift or carry 10 pounds; stand and/or walk for at least two hours in an eight-hour workday; sit for about six hours in an eight-hour workday; could perform no activities requiring vigorous push/pull with her upper or lower extremities; could occasionally reach overhead with her bilateral upper extremities; and could concentrate on, understand, and remember routine, repetitive task and three and four step uncomplicated instructions, carry out such tasks with adequate persistence and pace, tolerate brief and superficial contact with co-workers and routine contact with the public, tolerate ordinary routines without special supervision, and tolerate the routine stressors of a routine, repetitive, and three and four step work settings.

7.      The claimant is unable to perform any of her past relevant work (20 CFR § 404.1565).

8.      The claimant is a "younger individual" (20 CFR § 404.1563).

9.      The claimant has a high school education obtained through a general equivalency diploma (20 CFR § 404.1564).

10.     The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in the case (20 CFR § 404.1568).

11.     The claimant has the residual functional capacity to perform a significant range of sedentary work (20 CFR § 404.1567).

12.     Although the claimant's exertional limitations do not allow her to perform the full range of sedentary work, using Medical-Vocational Rules 201.28 and 201.21 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include the following: bench work assembly positions such as a final assembler, bench hand, lamp shade assembler, band attached, and numerous similar occupations, of which more than 5000 such jobs exist in the state of Minnesota; inspecting/grading/sorting positions done

at a table or workbench such as dowel inspector, table worker, sorter, and other similar positions, of which more than 650 such jobs exist in the state of Minnesota.  The undersigned notes that such jobs are just examples of jobs that such an individual could perform and finds that commensurately greater numbers of such jobs exist in the national economy.

13.    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(g)).

(Tr. 35-36).

## B.    The ALJ's Application of the Five-Step Process

In reaching his findings, the ALJ made the following determinations under the five-step procedure.  (Tr.  16-36).  At the first step, the ALJ found that plaintiff had engaged in substantial gainful activity from the time of her alleged onset date of June 29, 2000, until January 1, 2001, but not thereafter.  (Tr. 17).  At the second step, the ALJ found that plaintiff was subject to severe impairments consisting of degenerative disc disease of the cervical and lumbosacral spine, fibromyalgia, osteoarthritis of the hands and right knee, and a depressive disorder.  (Tr. 18).  At the third step, the ALJ determined that plaintiff's impairments did not meet, or medically equal, either singularly, or in combination, any listed impairments of the Listing of Impairments of Appendix 1, Subpart P, Regulations No. 4.  (Tr. 18).  At the fourth step, the ALJ found that plaintiff did not retain the residual functional capacity ("RFC") to perform any of her past relevant work.  (Tr. 33).  At the fifth step the ALJ determined that plaintiff retained the RFC to perform work that exists in significant numbers in the national economy.  (Tr. 34).  Thus, the ALJ found that plaintiff was not under a disability as defined in the Social Security Act at any time through the date of the decision. (Tr. 34-35).

**V.**  **ISSUES UNDER REVIEW**

On appeal, plaintiff contends that the ALJ failed to: 1) follow the directives of the Appeals Council on remand, specifically by failing to develop the record in accord with the Appeals Council order; 2) give proper weight to the opinions of her treating physicians; 3) accord proper weight to her subjective complaints; and 4) propound a proper hypothetical to the Vocational Expert. See Plaintiff's Mem., pp. 27-42; [Docket No. 17]. In her motion for summary judgment, plaintiff asks this Court to reverse the final decision of the Commissioner of Social Security ("Commissioner") and award benefits, or in the alternative to remand the matter for further administrative proceedings. Id., at 42. In his cross-motion for summary judgment, the Commissioner asks this Court to deny Plaintiff's motion for summary judgment and affirm the decision of the Commissioner denying Plaintiff's claims for disability benefits. See Defendant's Mem., p. 49; [Docket No. 21].

**A.**  **Appeals Council Directives on Remand**

Plaintiff contends that the Appeals Council mandated that the ALJ on remand obtain additional evidence and request the treating and examining sources to provide additional evidence or further clarification of the opinions and medical source statements. Plaintiff argues that the ALJ's failure to obtain an orthopedic consultative examination (or at least explain why he did not obtain such an examination), and to obtain medical source statements from plaintiff's treating physicians, requires reversal of the ALJ's decision.

"[T]he ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004) (citing Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000);

<u>Landess v. Weinberger</u>, 490 F.2d 1187, 1188 (8th Cir. 1974)).  The ALJ has no interest in denying benefits and must act with neutrality.  <u>Id.</u> (citing <u>Richardson v. Perales</u>, 402 U.S. at 410).  The ALJ's "duty may include seeking clarification from treating physicians if a crucial issue is undeveloped or underdeveloped."  <u>Smith v. Barnhart</u>, 435 F.3d 926, 930 (8th Cir. 2006) (citing <u>Stormo v. Barnhart</u>, 377 F.3d 801, 806 (8th Cir. 2004)).

In this case, the Appeals Council vacated the original decision of the ALJ because the hearing tape could not be located, and thus, the Appeals Council concluded that the record was incomplete.  (Tr. 127).  The Appeals Council then remanded the case back to the ALJ and directed him to "[o]btain additional evidence concerning the claimant's impairments in order to complete and update the administrative record[,]" and that "additional evidence will include, if available, a consultative orthopedic examination and medical source statements about what the claimant can still do despite the impairments."  (Tr. 127).  The Appeals Council further indicated that "[a]s appropriate, the [ALJ] may request the treating and examining sources to provide additional and/or further clarification of the opinions and medical source statements about what the claimant can still do despite the impairments."  (Tr. 128).

In support of her argument that the ALJ's decision cannot be upheld because he failed to follow the remand order of the Appeals Council, plaintiff cites to <u>Sullivan v. Hudson</u>, 490 U.S. 877, 886 (1984) and <u>Mefford v. Gardner</u>, 383 F.2d 748 (6th Cir. 1967), for the proposition that deviation from the remand order in subsequent proceedings is legal error, subject to reversal on further judicial review.

As preliminary matter this Court notes that both <u>Sullivan</u> and <u>Mefford</u> involved procedural postures where a federal court had remanded the matter for further administrative proceedings, as opposed to a remand order from the Appeals Council.[1] Nevertheless, the Court accepts the proposition that the ALJ must comply with the clear directives of the Appeals Council.

Thus, the question is whether the ALJ complied with the directives of the Appeals Council on remand.  In response to plaintiff's argument, the Commissioner maintains that the Appeals did not "mandate" that the ALJ take any specific action on remand, but rather used permissive language, such as "if available," "as appropriate" and "may request."

The Appeals Council vacated the original decision of the ALJ and remanded back to the ALJ because the hearing tape from the original hearing could not be located.  The Appeals Council did not find that the ALJ's original decision was in any other way deficient.   While the Appeals Council could have used less awkward phrasing, such as "if necessary" as opposed to "if available," the Court agrees with the Commissioner that the Appeals Council did not dictate that the ALJ obtain a consultative orthopedic examination, or additional information or explanations from plaintiff's treating and examining providers.   The Court also agrees with the Commissioner that the record was fully and fairly developed as of the date of the hearing and that it was not necessary to obtain a consultative examination or clarifying statements from the medical sources of record.  In this regard, the Court notes that the

---

[1]     In <u>Sullivan,</u> the Court of Appeals reversed the District Court's determination that the ALJ's decision was supported by substantial evidence and remanded for further administrative proceedings; in <u>Mefford</u>, the District Court vacated the decision of the hearing examiner and remanded for further administrative proceedings.

record was replete with records from a variety of medical sources regarding plaintiff's alleged impairments covering the period from the first hearing in February 2002 through the second hearing in May 2005.  (Tr. 284, 294, 298, 352-53, 339, 364, 368, 374, 381, 413).   In any event, by affirming the ALJ's subsequent opinion, it is evident that the Appeals Council was satisfied that the ALJ had fulfilled the directives in its remand order.  See Greenbaum v. Barnhart, 2007 WL 1875826, *2 (3d Cir. 2007) (unpublished opinion).  For all of these reasons, this Court rejects plaintiff's argument that the ALJ's decision cannot be upheld because he failed to follow the remand order of the Appeals Council.

### B.   Plaintiff's Residual Functional Capacity

Although the ALJ bears the primary responsibility for determining a claimant's RFC, the RFC is a medical question.  See 20 C.F.R. §§ 404.1527(e) and 4167.927(e); Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000); Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004) (citing Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).  As such, some medical evidence must support the ALJ's RFC determination, and if necessary, the ALJ should obtain medical evidence addressing the claimant's ability to function in the workplace.  See Nevland, 204 F.3d at 858.  Generally, the opinion of a consulting physician alone does not constitute substantial evidence, but such an opinion in conjunction with other medical evidence in the record will support an RFC determination.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002); Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995).

Plaintiff contends that the record does not support the RFC determined by the ALJ.  Plaintiff argues that the ALJ improperly rejected the opinions of her treating and examining physicians, improperly imposed his own interpretation on medical source

opinions, and improperly accorded controlling weight to Dr. S. Ross Mangiamele, who examined plaintiff on referral.  Plaintiff also argues that the ALJ improperly rejected her subjective complaints of disability.  In response, the Commissioner argues that the ALJ reasonably found that while the record showed periodic exacerbations of symptoms, which improved significantly with treatment in short periods of time, at no time did plaintiff experience disabling symptoms for a continuous period of 12 months or more. The Commissioner further argues that the record reflects significant gaps in treatment for all of her impairments throughout the relevant time period.

### 1.    The Medical Record Available to the ALJ

In June of 2000, Dr. Edward Adams performed arthroscopic surgery on plaintiff's left knee to repair a torn medial meniscus and to remove cartilaginous loose bodies. (Tr. 236-39, 256, 264[2]).  Following the surgery, plaintiff was prescribed a knee brace and underwent physical therapy.  (Tr. 240-49).  On July 5, 2000, plaintiff reported to Dr. Adams that she had been "getting along comfortably."  (Tr. 255).  On August 4, 2000, plaintiff reported that her knee brace was not helping to alleviate her pain and discomfort.  (Tr. 254).  On September 15, 2000, it was noted that plaintiff was last seen in physical therapy on August 16, 2000, and at that time "was doing quite well with her range of motion and strength as well as her function."  (Tr. 240).  It was also noted that plaintiff continued to have some hamstring pain and tightness, but that she failed to

---

[2]    Plaintiff asserts that "X-rays in December of 2000 showed advanced osteoarthritic changes in her left knee with pronounced spurring and sclerosis, and marked narrowing of the medial compartment."  Plaintiff's Mem., p. 3.  Plaintiff appears to have mistaken the date the X-rays were taken with the date the note was completed. It appears from the record that the X-rays were taken on June 26, 2000, just prior to plaintiff's arthroscopic surgery.  (Tr. 264).  The note also indicates that the "date completed" was December 8, 2000.  (Tr. 264).  Plaintiff did, however, have X-rays of her interphalangeal joints on December 8, 2000.  (Tr. 264).

attend weekly recheck appointment that were set up for her and that attempts to contact plaintiff had been unsuccessful.  (Tr. 240).

On May 3, 2001, plaintiff saw Dr. Larry A. Houtchens for complaints of severe pain in her lower back.  (Tr. 321).  Plaintiff reported that she had turned over wrong in bed.  (Tr. 321).  Dr. Houtchens noted that plaintiff had a "slipped disc" in her lower back several years prior, but that physical therapy had resolved the problem until she presented to him.  (Tr. 321).  Dr. Houtchens observed that plaintiff was "in apparent, exquisite pain[,]" and needed assistance with ambulation.  (Tr. 321).  Dr. Houtchens noted point tenderness at the right low lumbar area, exquisite tenderness to palpation of the right SI joint,[3] normal sensation and muscle strength in both lower extremities, and a slightly positive straight raise on the right side.  (Tr. 321).  Dr. Houtchens assessed plaintiff with right sacroiliac dysfunction and pain, thoracic back pain, and lumbar back pain. (Tr. 321).  Dr. Houtchens prescribed Toradol, Ibuprofen, and Norflex, and referred plaintiff to physical therapy.[4]  (Tr. 321).

On September 17, 2001, plaintiff started seeing internal medicine physician, Dr. Vern Erickson, for treatment of neck pain and left lower arm and hand parasthesia. (Tr. 286).  Plaintiff reported that her symptoms had started approximately six weeks earlier.  (Tr. 286).  Plaintiff indicated that she had experienced similar problems in the past and that she had been treated by a chiropractor.  (Tr. 286).  Dr. Erickson noted that

---

[3]     "SI joint" refers to the sacroiliac joint, which is the "articulation between the sacrum and ilium and the ligaments associated therewith."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 526 (29th Ed. 2000).

[4]     "Toradol" is the brand name for ketorolac tromethamine, a nonsteroidal anti-inflammatory drug.  PHYSICIAN'S DESK REFERENCE 565-66 (61st Ed. 2007).  "Norflex" is an analgesic indicated for the relief of discomfort associated with acute painful musculo-skeletal conditions.  Id. at 1856.  "Ibuprofen" is an over-the-counter drug indicated for the temporary relief of minor aches and pains.  Id. at 1866.

plaintiff exhibited noticeable atrophy in her left medial quadriceps and calf area, but he was unsure of a connection to plaintiff's knee surgery.  (Tr. 286).   Dr. Erickson diagnosed plaintiff with a cervical sprain or strain and recommended manual manipulation on an as-needed basis at plaintiff's request.  (Tr. 286).

On October 10, 2001, plaintiff underwent an MRI of her cervical spine, which revealed congenital fusion of C2 and 3.  (Tr. 267).  It was noted that there was reversal of cervical curvature at C4 through C6, and that small disc osteophyte complexes posterior to the disc spaces of C4-5 and 5-6, which mildly effaced the ventral epidural spaces, but without compression of the cervical cord.  (Tr. 267).  The MRI further revealed facet arthropathy bilaterally at the levels of C4-5 and C3-4, and disc spaces were generally narrowed from C4 to C7 posteriorly.  (Tr. 267).  After reviewing the MRI, Dr. Erickson noted that plaintiff had moderate to severe joint disease at C3 and C4. (Tr. 285).

On November 9, 2001, plaintiff saw Dr. David L. Weist, an orthopedic specialist, on referral from Dr. Erickson for her left knee.  (Tr. 280).  Plaintiff reported that she had tried physical therapy without much success and that she utilized Aleve and Tylenol.[5] (Tr. 280).  Plaintiff stated that she tried to walk up to three miles per day and that she has difficulty with any sitting type activities due to her back and neck problems. (Tr. 280).   Dr. Weist noted that X-rays obtained by Dr. Erickson showed significant flattening and narrowing of the medial joint space in the left knee with significant changes.  (Tr. 280).  Dr. Erickson also noted that plaintiff had large medial spurs and a high riding patella in her knee with trace effusion.  (Tr. 280).  Dr. Weist opined that

---

[5]       "Aleve" is an over-the-counter nonsteroidal anti-inflammatory drug.  PHYSICIAN'S DESK REFERENCE 742.  "Tylenol" is an over-the-counter analgesic/antipyretic for the temporary relief of minor aches and pains.  Id. at 1870.

plaintiff had some significant posttraumatic degenerative osteoarthritis of the left knee, and recommended switching from Aleve to Celebrex.[6]  (Tr. 280).  Dr. Weist stated that he was not sure if further knee surgery would give any long-term improvement. (Tr. 280).

In January of 2002, a state agency physician reviewed plaintiff's records and opined that plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds; stand or walk 6 hours in an 8-hour day; sit 6 hours in an 8-hour day; occasionally climb ramps or stairs; never climb ladders, ropes or scaffolds; and occasionally kneel, crouch, or crawl with limited reaching overhead.  (Tr. 271-72).

On February 13, 2002, plaintiff was seen by Danny D. Rickard a physician's assistant at Dr. Erickson's office, for complaints of sinusitis.  (Tr. 318-19).  Plaintiff also complained of a bump on her left thumb, which she originally injured the prior October while hunting.  (Tr. 319).   On May 1, 2002, plaintiff was seen again by Mr. Rickard and complained of scoliosis and worsening low back pain, pain in her left knee, and a decreasing range of movement in her left knee.  (Tr. 317).  Plaintiff reported that she has been staying active to keep her joints healthy and her range of motion good. (Tr. 317).  She stated she was walking about 3 miles a day, at least 3-4 days per week. (Tr. 317).  On May 8, 2002, plaintiff saw Mr. Rickard and complained of neck pain, back pain, left knee pain and for a check of a bone on her middle finger on her right hand. (Tr. 315).  Plaintiff stated she wanted to get some form of disability as she could not do many jobs she has tried.  (Tr. 315).  After examination of plaintiff, in which he found muscle tension in plaintiff's neck, crepitations and a lot of pain in her left knee, and no

---

[6]     "Celebrex" is a prescription nonsteroidal anti-inflammatory drug, with analgesic and antipyretic characteristics. PHYSICIAN'S DESK REFERENCE 3134.

issues with her right knee or right hand, Mr. Rickard referred plaintiff back to Dr. Weist. (Tr. 315-16).

On May 10, 2002, plaintiff saw Dr. Weist for a follow-up on her left knee pain. (Tr. 279).  Plaintiff reported that the Celebrex caused significant fluid retention and that she had stop using it.  (Tr. 279).  Plaintiff reported continued marked pain with prolonged sitting, standing or walking more than a block or two.  (Tr. 279).  Plaintiff stated that she continued taking Tylenol on an as-needed basis.  (Tr. 279).  On examination, Dr. Weist noted that plaintiff lacked 5 degrees of full extension of her left knee and flexed slowly only about 90 degrees.  (Tr. 279).  Plaintiff exhibited significant crepitance and pain both medially and anteriorly.  (Tr. 279).  Plaintiff exhibited some quadriceps weakness.  (Tr. 279).  Dr. Weist opined that plaintiff had very significant bicompartmental degenerative arthritis.  (Tr. 279).  Plaintiff indicated that she did not want cortisone injections, because she had relatives who had experienced problems with cortisone.  (Tr. 279).  Dr. Weist noted that an osteotomy would not be helpful because plaintiff had patellofemoral osteoarthritis.  (Tr. 279).  Dr. Weist observed that plaintiff would eventually be a candidate for knee replacement, but that her age was currently a deterrent.  (Tr. 279).  Dr. Weist also remarked that if plaintiff were to try a job, it would need to involve frequent changes of position, namely sitting, standing and limited walking, and that it could not be a job where she did any long-term sitting or standing.  (Tr. 279).

On May 15, 2002, plaintiff started physical therapy.  (Tr. 281).  Plaintiff complained of lumbosacral spine pain and spasm as well as cervical spine pain. (Tr. 281).  Plaintiff stated that the pain in her lumbar spine started "on May 10, 2002, when she transferred out of a chair at the physician's office."  (Tr. 281).  Plaintiff

reported that her back tended to spasm when she rolled over in bed, transferred out of a chair or with similar actions.  (Tr. 281).  Plaintiff was assessed with signs and symptoms of lumbosacral instability, and signs of myofascial pain at her cervical and upper thoracic spine.  (Tr. 282).  It was expected that plaintiff would respond positively to strengthening exercises and manual interventions such as myofascial release. (Tr. 282).  Plaintiff was scheduled to be seen 2-3 times per week for 4-6 weeks, but beyond the initial evaluation, there is no evidence that plaintiff continued with her physical therapy.  (Tr. 282).

On May 20, 2002, Dr. Erickson, by letter addressed to "To Whom It May Concern", indicated that plaintiff had an increased problem performing adequate work due to severe joint disease.  (Tr. 284).   Dr. Erickson noted that the joint disease involved both knees and the right hip, and that plaintiff had arthritis of both hands, worse in the left hand, and pain in her neck and lower back.  (Tr. 284).  Dr. Erickson remarked that X-rays showed "severe destruction of her knees[,]"but that her orthopedists opined that she was too young to have anything done about them at that time.  (Tr. 284). Dr. Erickson indicated that her knee problems inhibited her ability to walk and obtain any meaningful employment, and that the condition could be expected to continue without improvement until her knees could be replaced.  (Tr. 284).  Dr. Erickson also opined that plaintiff's lower back pain, particularly in the L2-3 and L5-S1 area, was severe and "is disabling."  (Tr. 284).  Dr. Erickson remarked that plaintiff's lower back pain limited her ability to ambulate, sit, and stand for any prolonged period of time. (Tr. 284).   Dr. Erickson noted that plaintiff's neck pain often caused headaches and progressive weakness in her upper extremities.  (Tr. 284).  Dr. Erickson concluded that "[d]eformities are limiting [plaintiff's] ability to maintain any meaningful employment and

my recommendation is to be put on disability because of the severity of her disease." (Tr. 284).

On August 16, 2002, plaintiff saw Dr. Ayesha Ebrahim, a colleague of Dr. Erickson. (Tr. 314). Plaintiff complained of a rash which started after she had been out picking choke cherries. (Tr. 314). Plaintiff reported that she was taking Aleve for her arthritis and Paxil[7] for mood swings, and "otherwise, [had] no other medical problems." (Tr. 314). Plaintiff again saw Dr. Ebrahim on August 28, 2002, for a lab test for rhabdomyolysis related to Baycol[8] medication she had been taking prior to recall. (Tr. 313). Dr. Ebrahim noted that plaintiff's medical history was significant for asthma and hyperlipidemia. (Tr. 313). Plaintiff reported generalized muscle aches and pains and denied any other complaints. (Tr. 313). Dr. Ebrahim noted that plaintiff's range of motion in her upper and lower extremities was within normal limits and equal bilaterally. (Tr. 313). An undated exam treatment report authored by podiatrist Dr. Brad Anderson, indicated that x-rays showed some plantar spurring. (Tr. 295). Dr. Anderson diagnosed plaintiff with plantar fasciitis.[9] (Tr. 295).

---

[7]    "Paxil" is the brand name for paroxetine hydrochloride, a psychotropic drug indicated for the treatment of Major Depressive Disorder, Obsessive Compulsive Disorder, Panic Disorder, Generalized Anxiety Disorder and Posttraumatic Stress Disorder. PHYSICIAN'S DESK REFERENCE 1530-31.

[8]    "Baycol" was the brand name for cerivistatin, a drug prescribed to lower the lipid levels of individuals with high cholesterol levels. In re Baycol Products Litigation, 218 F.R.D. 197, 200 (D. Minn. 2003). The drug was withdrawn from the market after it was linked to rhabdomyolysis and other diseases and it caused 31 deaths in the U.S. Id. Rhabdomyolysis "is an acute, fulminating, potentially fatal disease of the skeletal muscle, which entails destruction of the skeletal muscle." Id. at 200 n.1 (citing STEDMAN'S MEDICAL DICTIONARY (24TH ED. 1982)).

[9]    "Plantar fasciitis" is caused by a strain of the ligament that supports the arch of the foot and can lead to pain and swelling. See "Plantar Fasciitis," WebMD (July 28, 2005), found at http://www.webmd.com/a-to-z-guides/Plantar-Fasciitis-Topic-Overview.

On September 10, 2002, plaintiff had x-rays of both knees. (Tr. 310). Dr. Erickson noted that the left knee showed marked narrowing of the medial compartment space with spurring and a large osteophyte[10] on the tibial plateau and osteophytes on the inferior pole of the patella. (Tr. 310). Dr. Erickson noted no fracture, dislocation or soft tissue abnormality with the right knee. (Tr. 310). Dr. Erickson assessed plaintiff with severe degenerative osteoarthritis of the left knee, a bilateral plantar spurs greater on the right. (Tr. 310). Plaintiff saw Mr. Rickard that same day, complaining of chronic knee pain, worse on the left. (Tr. 308). Mr. Rickard noted that plaintiff had been told by her orthopedists that they wanted to wait at least 10 more years before considering a total knee replacement. (Tr. 308). Mr. Rickard noted that plaintiff had gone through physical therapy and that she was continuing muscle strengthening exercises and stretching for her knees. (Tr. 308).

On September 19, 2002, plaintiff saw Dr. Ebrahim for a follow-up examination for previously diagnosed plantar fascitis. (Tr. 311). Plaintiff stated that she needed a letter of disability with a special emphasis on plantar fasciitis. (Tr. 311). Dr. Ebrahim recommended that plaintiff continue with ice compression, elevation, Dr. Anderson's recommendations, and Motrin for pain. (Tr. 311). Dr. Ebrahim noted that plaintiff was to see a podiatrist the following day for the plantar fasciitis. (Tr. 312). Dr. Ebrahim also noted that plaintiff would return to Dr. Erickson in a week or two to get restrictions and a letter for disability. (Tr. 312). Nonetheless, that same day, Dr. Ebrahim issued a letter addressed to "To Whom It May Concern" noting that plaintiff had degenerative osteoarthritis and severe degenerative intervertebral disc disease at L2-3 and L5, S1 with left-sided scoliosis. (Tr. 294). Dr. Ebrahim also noted that degenerative changes

---

[10]     An osteophyte is a "bony excrescence or osseous outgrowth." DORLAND'S 1290.

were present in the cervical spine and that plaintiff had been diagnosed with plantar fasciitis. (Tr. 294). Dr. Ebrahim noted that plaintiff would ultimately require total knee replacement, but that her age was a deterrent at that time. (Tr. 294). Dr. Ebrahim opined that plaintiff's deformities caused significant functional limitation, including an inability to maintain any meaningful employment, and recommended that plaintiff be placed on disability due to the severity of her disease. (Tr. 294).

Another undated note from Dr. Anderson, indicated that plaintiff had responded well to exercises, anti-inflammatories, massage, and ice therapy. (Tr. 296). Dr. Anderson also noted that when plaintiff discontinued anti-inflammatories, her symptoms returned. (Tr. 296). Dr. Anderson opined that the best treatment for plaintiff would be rigid, custom made orthotics to control her unstable motion and that she begin walking again. (Tr. 296).

On October 7, 2002, plaintiff saw Dr. Erickson after falling at home on some stairs. (Tr. 306). Plaintiff feared that she had fractured her left hand. (Tr. 306). Despite some swelling, x-rays did not reveal a fracture and Dr. Erickson opined that the swelling should resolve with time. (Tr. 306).

Dr. Weist requested an orthotic consultation for plaintiff, and on October 17, 2002, plaintiff was measured and fitted for a unloader brace for her left knee. (Tr. 355). On October 25, 2002, plaintiff was instructed how to use the brace and remarked that it looked and felt good to her. (Tr. 355). Plaintiff stated that the brace relieved the pain in her leg as she ambulated. (Tr. 355).

On December 2, 2002, plaintiff followed up with Dr. Ebrahim relative to her Social Security disability claim which had been denied. (Tr. 303). Dr. Ebrahim noted that plaintif had a history of degenerative osteoarthritis in her left knee and degenerative disk

22

disease changes in the cervical spine and lumbrosacral spine and a history of recently diagnosed plantar faciitis.  (Tr. 303).  Dr. Ebrahim indicated that she would review her charts in detail and evaluate plaintiff in a week and that her recommendations would be based on her findings at the next visit.  (Tr. 303).  On December 10, 2002, plaintiff followed up with Dr. Ebrahim.  (Tr. 301).  Plaintiff reported to Dr. Ebrahim that as to functional limitations, she could sit for 10-15 minutes at a time, but that then she had to get up and walk around, and that she could stand for 10-15 minutes at a time before she has to sit down.  (Tr. 301).  Dr. Ebrahim noted that plaintiff had significant osteoarthritis in her hands, significant limitation of flexion in her left knee secondary to pain, almost complete flexion of the right knee, and a full range of motion at the ankle joints, shoulders and elbows.  (Tr. 301).  Dr. Ebrahim observed mild tenderness upon palpation in the lumbosacral area of plaintiff's back.  (Tr. 301).  Dr. Ebrahim assessed plaintiff with degenerative osteoarthritis with functional limitations secondary to pain. (Tr. 302).  Dr. Ebrahim stated that plaintiff needed a letter to appeal the no disability finding.  (Tr. 302).

On December 13, 2002, plaintiff followed up with Dr. Weist relative to her Social Security disability claim.   (Tr. 298).   Plaintiff reported that she continued to be unemployed because she was having difficulty with any standing, squatting or kneeling. (Tr. 298).   Dr. Weist indicated that he had strongly recommended that plaintiff only consider  sedentary type work with limited standing (less than an hour or so a day) and no climbing, squatting or kneeling.  (Tr. 298).  Dr. Weist opined that plaintiff's left knee had not improved, but that her unloader brace allowed her to walk further than she had been able to in the past.  (Tr. 298).  Dr. Weist noted that plaintiff's right knee exhibited crepitus anteriorly, but that x-rays obtained in September did not show the degree of

arthritic change in her left knee.  (Tr. 298).  Dr. Weist assessed plaintiff with significant osteoarthritis of the left knee and again noted that she might eventually be a candidate for knee replacement.  (Tr. 298).  Dr. Weist recommended holding off on any surgical procedure for her right knee.  (Tr. 298).

On April 29, 2003, plaintiff saw Dr. James Lessard, a rheumatologist.  (Tr. 347). Plaintiff's chief complaint was pain in her knees and back.  (Tr. 347).  Plaintiff reported that her knees problems began around age 16, when she fell while rollerskating, but that her symptoms were minimal until age 23 when she began experiencing pain and swelling in her knee.  (Tr. 347).  Plaintiff indicated that Dr. Jeff Chapman, an orthopedist in Fargo, as well as Dr. Adams and Dr. Weist, had recommended total knee replacement, but that she would need to wait until she was older.  (Tr. 347).  In addition to her knee and spine pain, plaintiff indicated that she ached all over, including the muscles of her neck and shoulders, back, arms, elbows, chest, masseter muscles, lateral hips, thighs and legs.  (Tr. 347).  Plaintiff reported paresthesias involving both hands, sleep interruption, insomnia and fatigue.  (Tr. 348).  Plaintiff denied being depressed.  (Tr. 348).

On examination, Dr. Lessard observed that the musculature and bony structures of both upper and lower extremities were normal and symmetric, although her left leg appeared to be approximately 3 cm shorter than the right.  (Tr. 350).  Plaintiff's left knee demonstrated some crepitations involving the tibiofemoral joint with a small effusion, some pain on motion and tenderness to palpation.  (Tr. 350).  Dr. Lessard noted significant planovalgus[11] deformity bilaterally and mild hallux valgus[12] bilaterally, but that

---

[11]     A condition in which the longitudinal arch of the foot is flattened and the hindfoot everted.  STEDMAN'S MEDICAL DICTIONARY 1392 (27th Ed. 2000).

the other small joints of the hands, wrists, elbows, shoulders, hips, right knee, ankles, and feet were free of synovitis, abnormal range of motion, pain on motion or tenderness to palpation. (Tr. 350). Plaintiff exhibited tender points with a positive jump sign in her trapezius muscles, levator scapulae muscles, paraspinous muscles, occipital area, masseter muscles, costochondral junctions, bicipital tendons, medial and lateral epicondyles, trochanteric bursae, pes anserine bursae, and presacral bursae. (Tr. 351).

Dr. Lessard diagnosed plaintiff with mild osteoarthritis of the hands, reversible cervical lordosis of the cervical spine, obesity, fibromyalgia, bilateral planovalgus deformity, short left leg secondary to flexion contracture of the left knee, thoracolumar scoliosis, a history of allergy to Demerol, history of heart murmur, history of cigarette smoking, history of paresthesias in her fingers, history of paresthesias along the left side of her face, and a history of probably depression which was probably aggravating her fibromyalgia. (Tr. 351-52). Dr. Lessard gave plaintiff an injection of Kenalog[13] in her left knee and recommended strengthening and range of motion exercises. (Tr. 352). Dr. Lessard opined that due to the degenerative disease in her left knee, plaintiff would need the following restrictions:

> She is not to stand, walk, or run for a period of greater than 15 minutes without a similar resting time. She should not carry, lift, push, or pull any object heavier than 10 pounds, once, twice, or many. She should refrain, if at all possible, from walking stairs or ladders, etc. She should also refrain from any activity requiring her to squat down on her haunches or crawl down on her knees, etc., totally. She may sit indefinitely, use her

---

[12]     Angulation of the big toe away from the midline of the body, or toward the other toes; the big toe may ride under or over the other toes. DORLAND'S 783.

[13]     "Kenalog" is the brand name for triamcinolone, a corticosteriod indicated for the treatment of a number of different diseases including arthritis. See Drugs.com, Kenalog-10, found at http://www.drugs.com/cons/kenalog-10.html (last accessed August 13, 2007).

upper extremities, from what I can tell today, indefinitely without restrictions.

(Tr. 352-53).

On June 19, 2003, plaintiff followed up with Dr. Lessard, reporting that the injection he gave her "into her left knee resulted in good relief and helped "tremendously with about 85% relief of her pain."  (Tr. 345).  Plaintiff also stated that as long as she wore her brace she was able to ambulate.  (Tr. 345).  Plaintiff reported that overall her aches and pains were 75% better and were "livable", although she did have some low back pains with spasms.  (Tr. 345).  The results of Dr. Lessard's examination were similar to his examination in April 2003.  (Tr. 345).  Dr. Lessard prescribed Amitriptyline and Tramadol[14] and indicated that he would follow up with plaintiff in approximately three months.  (Tr. 346).

On July 16, 2003, plaintiff saw Samantha A. Grover, a psychiatric mental health clinical nurse specialist, reporting that she was depressed, tearful, irritable, moody, fatigued, and stressed.  (Tr. 336-41).  Plaintiff reported that her father had died two weeks prior and that she had taken care of her husband, who had MS, for 13 years. (Tr. 341-341A).  Ms. Grover noted that plaintiff presented with severe symptoms of depression and anxiety.  (Tr. 339).  Plaintiff reported that she was financially strained and disagreed with some of her husband's purchases, and that she was having difficulty with her husband regarding the behavior of his children from his first marriage.  (Tr. 336, 339).  Plaintiff also reported that her husband had lied to her in the past and that she

---

[14]     "Amitriptyline" is a tricyclic antidepressant primarily indicated for the treatment of depression, but also used in the treatment of chronic pain.  See MedlinePlus, found at http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682388.html  (last  accessed July 26, 2007).  Tramadol hydrochloride is a synthetic opioid analgesic prescribed "for the management of moderate to moderately severe pain in adults[,]" with effects similar to those of other opioids.  PHYSICIAN'S DESK REFERENCE 2392-93.

was suspicious of him.  (Tr. 336).   Ms. Grover diagnosed plaintiff with depression and bereavement disorder, and assigned a Global Assessment of Functioning score of 65.[15] (Tr. 339).  Plaintiff was prescribed Effexor and Ambien,[16] and encouraged to attend a bereavement group.  (Tr. 339).  Plaintiff followed up with Ms. Grover on August 25, 2003, reporting that her sleep was good, her husband had instituted new rules, and that she had a new found respect from her husband.  (Tr. 327).  Plaintiff stated: "Effexor saved my marriage."  (Tr. 327).  Ms. Grover observed that plaintiff appeared bright, engaged, happy and talkative, and noted that plaintiff's mood was normal.  (Tr. 327).

On July 28, 2003, plaintiff saw Dr. Ebrahim for the purpose of obtaining a letter that she is currently employed because of her physical condition.  (Tr. 299).  At this visit, plaintiff reported to Dr. Ebrahim that her back was most painful.  (Tr. 299).  Plaintiff indicated that the treatment Dr. Lessard recommended took care of her knee pain. (Tr. 299).  Dr. Ebrahim noted that plaintiff had applied for work in several grocery stores, but had not yet heard back from them.  (Tr. 299).  Dr. Ebrahim indicated that she would mail a letter to plaintiff indicating that she was currently unemployed on account of her physical condition. (Tr. 299).

---

[15]    The Global Assessment of Functioning scale is used to assess an individual's overall level of functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th Ed. Text Rev. 2000).  The lower the score, the more serious the individual's symptoms. Id.  GAF scores in the range of 61-70 indicate "mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational or school functioning (e.g., occasional truancy, or theft within the household)[.]" Id., 34.

[16]    "Effexor" is the brand name for venlafaxine hydrochloride, an antidepressant indicated for the treatment of Major Depressive Disorder. PHYSICIAN'S DESK REFERENCE 3411-12.  "Ambien" is the brand name for zolpidem tartrate, a non-benzodiazepine hypnotic indicated for the treatment of insomnia. PHYSICIAN'S DESK REFERENCE 2851-52.

On September 25, 2003, plaintiff again saw Dr. Lessard, complaining of pain in her midline low back, and her muscles in her neck and her shoulders.  (Tr. 343). Plaintiff reported that the knee brace definitely helped, but that she had stopped taking the Amitriptyline after two weeks because she felt there was a lack of response. (Tr. 343).  Dr. Lessard noted that plaintiff had never started the Tramadol, although he was not sure why.  (Tr. 343).  The results of Dr. Lessard's examination were similar to his examinations in April and June 2003.  (Tr. 343).  Dr. Lessard assessed plaintiff with mild osteoarthritis of the hands, and osteoarthritis of the medial compartment of the left knee, symptomatically controlled with the unloader brace.  (Tr. 343).  Dr. Lessard also noted that plaintiff was noncompliant with the Amitriptyline and Tramadol therapy. (Tr. 344).

On December 1, 2003, plaintiff saw Dr. Harry G. Miller for complaints of pain in her neck, left knee, and back.  (Tr. 412).  Plaintiff reported to Dr. Miller that her brace hurt her more than it helped her.  (Tr. 412).  Plaintiff reported that she was not interested in steroid epidurals because the Kenalog shots given to her by Dr. Lessard resulted in significant weight gain.  (Tr. 412).  Plaintiff reported very little activity at home due to her pain.  (Tr. 412).  On examination, Dr. Miller noted that plaintiff was positive for numerous areas of musculoskeletal complaints and exhibited a limited range of motion in her spine.  (Tr. 412).  Dr. Miller observed that x-rays of her knees showed severe degenerative joint disease of the left knee in all three compartments, mild degenerative arthritis in her right knee, significant arthritis of the lumbar spine with mild scoliosis, and degenerative disc disease of the cervical spine with subluxation and a tendency to reversal of the lordotic curve with some displacement but no significant stenosis.  (Tr. 412).  Dr. Miller stated that plaintiff came in with a cane but that she

should have a walker.  (Tr. 412).  Dr. Miller recommended that plaintiff continue with her present regimen.  (Tr. 413).  Dr. Miller opined that her long-term prognosis was extremely poor and that she was incapable of gainful employment due to serious physical ailments as well as her depression.  (Tr. 413).

On April 2, 2004, plaintiff followed up with Dr. Miller again reporting that her unloader brace had been uncomfortable since she first started wearing it.  (Tr. 410).  Dr. Miller indicated that plaintiff would do better with a double-bar brace and referred her to a consultation to obtain a new brace.  (Tr. 410).

In June of 2004, plaintiff underwent an MRI of her lumbar spine, which showed broad-based disc bulges at L1-2, L2-3, and L3-4 without significant spinal canal or neural foraminal stenosis.  (Tr. 408).  Modic changes were seen at the end plates at the L2-3 disc space, bone marrow signal was otherwise normal, and mild hypertrophic changes in the lower lumbar facet joints were noted.  (Tr. 408).  On June 17, 2004, Dr. Miller sent a letter to plaintiff indicated that the MRI demonstrated significant disc bulging, but that it did not show any pinching of nerves.  (Tr. 406).  Dr. Miller opined that plaintiff's pain was probably secondary to the arthritis of the joints in her back.  (Tr. 406).

On June 1, 2004, Dr. Gregory H. Salmi, a state agency physician, reviewed the record and opined that plaintiff was capable of lifting no more than 10 pounds, sitting about six hours in an eight hour workday, and standing/walking two hours in an eight hour workday.  (Tr. 368, 374).  A second State agency physician concurred with Dr. Salmi's opinion on September 10, 2004.  (Tr. 374).

On July 2, 2004, plaintiff followed up with Dr. Miller for continued discomfort in her lumbar spine.  (Tr. 404).  Plaintiff also reported significant problems with her left leg, stating that at times it was paralytic.  (Tr. 404).  Dr. Miller noted that plaintiff walked with

a limp and waddling gait.  (Tr. 404).  Dr. Miller observed that plaintiff's cervical spine, left elbow and hip had a decreased range of motion.  (Tr. 404).  Dr. Miller remarked that plaintiff's MRI of her lumbar spine showed "a really significant disk disease of numerous lumbar spaces . . . [which] may be compromising her leg strength on the left."  (Tr. 404). Dr. Miller diagnosed plaintiff with severe degenerative disk disease of the lumbar spine, degenerative arthritis of the left knee, degenerative arthritis of the cervical spine, mild obesity, and probable neuropathy of the left quadriceps.  (Tr. 404).  Dr. Miller indicated that plaintiff would have an EMG of her lower extremities.  (Tr. 404).

On  September  2,  2004,  Joel  T.  G.  Kirchner,  Psy.  D.,  L.P.,  performed  a consultative psychological examination of plaintiff.  (Tr. 377-82).  During the course of the examination, plaintiff demonstrated pain type behaviors, such as leaning forward in her chair, stretching multiple times, standing multiple times, and adjusting her position numerous times.  (Tr. 377).  Plaintiff reported that she experienced chronic pain and that its onset was about 12 years ago.  (Tr. 378).  She rated her average daily pain as "nine in her knees and back."  (Tr. 378).  Plaintiff indicated that she used Aleve to manage her pain, although she claimed it was always there.  (Tr. 378).  Plaintiff stated that the chronic pain affected her sleep which caused fatigue and lethargy.  Plaintiff denied any severe emotional programs, although she had stated that she had chronic grief from the loss of her husband, geographic relocation and loss of her home in Grand Forks due to the floods in the late '90s, and that these losses in combination with her deteriorating health had left her emotionally struggling. (Tr. 378).  Nevertheless, plaintiff indicated that her mood had been stabilized with Effexor, that she was managing her emotional problems, and that her concentration and memory were intact.  (Tr. 378). Plaintiff reported that much of her day was spent doing household chores, but that tasks

took her significantly longer than in the past.  (Tr. 379).  Plaintiff stated that she watched TV about 1 ½ hours per day, and that she took a lot of naps.  (Tr. 379)  Plaintiff indicated that she was able to fulfill most adult living responsibilities without assistance, but that she needed help putting on socks and shoes.  (Tr. 379).  Plaintiff also stated that she would vacuum, dust, pick up after family members, do dishes, cook, and do laundry, however, she could only work at a task for a few minutes before she has to either rest or shift to a different task.  (Tr. 379).

On mental status examination, Dr. Kirchner noted that plaintiff was easily engaged, gregarious and pleasant throughout the evaluation.  (Tr. 380).  Dr. Kirchner observed that plaintiff's thoughts were spontaneous, linearly arranged and terminated in understandable conclusions, and he discerned no major thought disorder.  (Tr. 380). Plaintiff's mood was bright and she described it as stable.  (Tr. 380).  Plaintiff performed well on immediate and delayed recall, serial sevens, addition and subtraction to five places, and exhibited a good understanding of current events.  (Tr. 380).  Dr. Kirchner observed that plaintiff's knowledge was well-developed, and judgment and abstract reasoning were very good.  (Tr. 380).  Dr. Kirchner estimated that plaintiff's IQ fell in the average to above average range.  (Tr. 380).  Dr. Kirchner noted no characterological problems, instead finding that plaintiff had a pain disorder based on diagnosed medical conditions recognized to generate chronic pain.  (Tr. 380).  Dr. Kirchner summarized that plaintiff was in partial to full remission for depression and that no other problems were discerned during the evaluation.  (Tr. 381).

Dr. Kirchner assessed plaintiff with Major Depression (by history) and Alcohol dependency (in full remission).  (Tr. 381).  Dr. Kirchner stated that plaintiff had the ability to understand remember and follow instructions, the capacity to sustain attention and

concentration, and the ability to respond appropriately to brief and superficial contact with coworkers and supervisors, but that she probably did not have the capacity to work independently and that as a result of her physical problems, she probably could not carry out work-like tasks with reasonable persistence or pace.  (Tr. 381).  Dr. Kirchner opined that plaintiff's medical problems and emotional disorder would probably work synergistically, lowering her frustration tolerance and impairing her ability to tolerate the stress and pressure typically found in an entry-level workplace was impaired.  (Tr. 381).

On September 1, 2004, plaintiff saw Dr. David M. Schall on referral from Dr. Miller to address her knee pain.  (Tr. 375-76, 401).  Plaintiff reported pain in her left knee as 9 out of 10 and stated that sitting was and 8 out of 10.  (Tr. 375).  Plaintiff stated that Aleve occasionally helped her pain.  (Tr. 375).  Plaintiff told Dr. Schall that she had received cortisone injections in her knee every three months for a total of seven years, but that she was told to discontinue due to cardiac changes.  (Tr. 375).  Plaintiff also reported to Dr. Schall that she was not working and that she was on disability secondary to chronic back pain.  (Tr. 375).  Dr. Schall opined that the only treatment option available to plaintiff was Synvisc injections into her knee, and after discussing the treatment with plaintiff she was given an injection.  (Tr. 376).

On October 18, 2004, James M. Alsdurf, Ph.D., a state agency psychologist, reviewed the record.  (Tr. 366).  Dr. Alsdurf opined that plaintiff retained the capacity to concentrate on, understand and remember routine, repetitive tasks, and three and four step, uncomplicated instructions; her ability to carry out tasks with adequate persistence and pace would be moderately impaired, but adequate for routine, repetitive tasks; her ability to get along with co-workers would be moderately impaired, but adequate for brief and superficial contact; her ability to interact with the public would not be significantly

impaired; her ability to sustain an ordinary routine would not be significantly impaired; and her ability to handle stress would be moderately impaired, but adequate to tolerate the routine stressors of a routine, repetitive and three and four step work setting. (Tr. 366).

On February 25, 2005, plaintiff saw orthopedic surgeon, Dr. Glenn R. Johnson for her complaints of the left knee pain and instability. (Tr. 425). Plaintiff stated that her pain had increased and caused her to awake at night when turning over in bed. (Tr. 425). Plaintiff stated that she had difficulty performing usual activities of daily living. (Tr. 425). Dr. Johnson observed that plaintiff ambulated with a painful gait, and that she had pain with squatting, twisting and turning. (Tr. 426). Dr. Johnson gave plaintiff an injection in her knee. (Tr. 426). On March 23, 2005, Dr. Johnson performed a partial left knee replacement on plaintiff. (Tr. 430). On follow up a week later, Dr. Johnson noted: "Her pain level is minimal! No complaints. Very pleased with early results." (Tr. 424). Dr. Johnson noted that plaintiff was now able to sleep at night. (Tr. 424).

On May 22, 2005, six weeks after the surgery, plaintiff reported that she was very pleased with the results and that her pain level was almost zero. (Tr. 429). Dr. Johnson indicated that plaintiff had "excellent" results from the surgery. (Tr. 429). Plaintiff continued to report some lower back pain, and Dr. Johnson recommended that plaintiff see Dr. S. Ross Mangiamele. (Tr. 429).

On May 23, 2005, plaintiff saw Dr. Mangiamele for low back pain. (Tr. 435-37). Plaintiff reported a history of lower back pain of many years duration. (Tr. 435). Plaintiff stated that she experienced sharp pain with intermittent exacerbation with twisting, lifting, and forward flexion in her lower lumbar spine. (Tr. 435). Dr. Mangiamele observed that while there was evidence of disc bulging in her lumbar spine, there was

no evidence of neural foraminal stenosis or spinal stenosis.  (Tr. 435).  Dr. Mangiamele noted that EMG studies revealed no denervation potentials with the right lower extremity, that there were denervation potentials demonstrated within the bilateral paraspinous muscles at multiple levels.  (Tr. 435).  On examination, Dr. Mangiamele observed that plaintiff was in no obvious discomfort and that she was able to transfer from the interview chair to the exam table without difficulty.  (Tr. 436).  Plaintiff demonstrated the ability to stand on her toes and heels, and evaluation of her lumbosacral spine revealed no significant limitations with forward flexions.  (Tr. 436).  Dr. Mangiamele assessed plaintiff with lumbosacral spondylosis and levoscoliosis and recommended continuation of physical therapy, including water exercises, and a weight loss program.  (Tr. 436).  Dr. Mangiamele opined that the EMG did not establish a diagnosis of lumbosacral radiculopathy, noted that plaintiff was without evidence of intractable pain or motor weakness, and was not a candidate for surgical intervention. (Tr. 436).

### 2.    Medical Evidence Received Subsequent to the ALJ's Decision

On August 5, 2005, an x-ray indicated that plaintiff's left knee joint space was well aligned but that there was mild arthritic change involving the lateral compartment. (Tr. 458).  The x-ray of the right knee showed normal alignment with no significant narrowing of the joint space seen.  (Tr. 458).  That same day, Dr. Johnson diagnosed plaintiff with a meniscal tear in her left knee and administered an injection, noting that if it did not work the next step would be arthroscopy.  (Tr. 466).

On August 5, 2005, plaintiff also saw Dr. Rae Keashly for a medication check and follow-up regarding her depression for which she is currently on Effexor.  (Tr. 451). Plaintiff stated that she had been sleeping poorly due to pain in her left knee.  (Tr. 451).

Plaintiff reported feeling helpless about not being able to work and not being able to do as much housework as she would like.  (Tr. 451).  Plaintiff asked Dr. Keashly for a letter to her insurance provider stating that she could not work.  (Tr. 451).  Dr. Keashly indicated that Dr. Johnson should be the one to write such a letter, but indicated that plaintiff had been told by Dr. Johnson that Dr. Keashly would need to be the one who sent the letter.  (Tr. 451).  Dr. Keashly noted that Dr. Johnson's recent notes indicated no problem with plaintiff's knee and no reason why she could not return to work. (Tr. 451).  Plaintiff stated to Dr. Keashly that she continued to have low back pain and requested a surgery appointment.  (Tr. 451).  Dr. Keashly recommended that she have a complete evaluation of her back.  (Tr. 451).  Dr. Keashly did note that "on review of the previous workup that has been done the comment usually is made that the back is not as bad as she has been lead to believe, so what she may require is some significant back retraining and physical therapy."  (Tr. 451).

On August 15, 2005, plaintiff saw Dr. Francis Denis on referral from Dr. Keashly for evaluation of her low back and neck pain.  (Tr. 461).  (Tr. 461).  Plaintiff reported that her back pain was much worse than her neck pain, that she could live with her neck pain, and that she had no real leg symptoms.  (Tr. 461).  Plaintiff indicated that the back pain was so bad that she was not able to do much work.  (Tr. 461).  Dr. Denis noted that plaintiff took Aleve occasionally, and that she had not had any formal physical therapy and really has not had any injections yet.  (Tr. 461).  On examination, Dr. Denis noted that plaintiff was normal neurologically, with slightly diminished reflexes in her upper extremities bilaterally.  (Tr. 460).  Dr. Denis reviewed her films and noted multi-level degenerative disc disease in her lower cervical spine and multi-level degenerative disc disease with facet disease in her lumbar spine.  (Tr. 460).  Dr. Denis opined that there

were no surgical options regarding her lower back, but that she might get some benefit from a fusion of C4 to C7 of her cervical spine.  (Tr. 460).  Plaintiff stated that she would think about it, but that she believed she could handle the pain in her cervical spine. (Tr. 460).  On October 17, 2005, Dr. Denis, by letter, indicated that plaintiff's symptoms in her cervical and lower back "limited her ability to work in any gainful employment." (Tr. 462).

### 3.    Plaintiff's Hearing Testimony

Plaintiff appeared and testified at the hearing held on May 20, 2005.  (Tr. 475). Plaintiff testified that she was unable to work due to her pain and back spasms. (Tr. 480).  Plaintiff stated that she had applied for jobs and grocery stores, restaurants, hardware stores, and gas stations, with the last application two weeks prior to the hearing, but that she had yet to receive a response from any of her applications. (Tr. 483-84).  Plaintiff testified that her condition was worse since the previous hearing, specifically that her arthritis in her back, knees, elbows and fingers was worse. (Tr. 497).  Plaintiff testified that her pain was sharp and constant, and estimated that it was about 8 on a scale of 10.  (Tr. 497).

Plaintiff stated that she would wake five to six times a night, but that it was probably habit because she used to have to wake up and "turn" her husband that many times per night for 13 years.  (Tr. 486).  Plaintiff testified that taking Effexor made her tired.  (Tr. 486).  Plaintiff stated that she would not take pain medications during the day because they put her to sleep.   (Tr. 498).   Plaintiff testified that the partial knee replacement six weeks prior to the hearing had partially helped.  (Tr. 488-89).  Plaintiff testified that hot baths helped alleviate the pain, but that cold would make it worse. (Tr. 498-99).

Plaintiff stated that she walked two to three times per week, but only a couple of blocks at a time. (Tr. 489). Plaintiff testified that she spent most of her day sleeping, that she was able to do some housework, but that she was unable to bend over to pick things up off the floor, and that her family helped with the housework. (Tr. 490). Plaintiff testified that she could sit for about an hour, stand for half an hour, and walk about two blocks. (Tr. 499). Plaintiff testified that she was unable to lift any amount of weight "out front" because it would pull on her lower back. (Tr. 499-500).

Plaintiff testified that she was unable to do laundry anymore because she could not negotiate the steps to the basement, and that she was told not to vacuum. (Tr. 492). Plaintiff stated that she could only sweep a little, because it involved twisting her back. (Tr. 493). Plaintiff stated that she had to quit gardening two years prior because of the pain in her knees and her back. (Tr. 493). Plaintiff testified that she enjoyed watching her grandson grow up, but that she was unable to pick him up or change his diaper. (Tr. 494). Plaintiff stated that she used to enjoy taxidermy, painting, canning, fishing, and riding motorcycles, but that she had to discontinue such hobbies. (Tr. 494). Plaintiff testified that she could drive to the grocery store without problem, which was four blocks away, and that she was able to use an electric cart to shop. (Tr. 495). Plaintiff stated that she would walk two blocks to the river to see if the fish were jumping. (Tr. 496-97). Plaintiff testified that she had stopped using Internet on a daily basis, because she had no reason to go on, other than to send e-mails. (Tr. 502).

### 4.    Activities of Daily Living Questionnaire

On May 7, 2004, plaintiff completed an Activities of Daily Living Questionnaire for the period from November 2001, through the date of the questionnaire. (Tr. 197-202). Plaintiff indicated that she was able to do one major chore per day, which included

vacuuming, dusting, mopping floor, cleaning the bathroom and bedrooms, doing laundry, preparing meals, and yard work. (Tr. 198). Plaintiff indicated that she could go up or down long stairs, be on a ladder, rake, carry anything, or kneel or bend. (Tr. 198). Plaintiff indicated that she cleaned the house and did yard work several times a day; drove, cooked, shopped, watched TV or listened to the radio, and bathed and groomed herself daily; visited friends and talked on the phone weekly; and read, attended sporting activities and visited relatives monthly. (Tr. 200). Plaintiff indicated that she had difficulty putting her socks on, raking, walking, and washing dishes. (Tr. 201).

On July 16, 2004, plaintiff completed another Activities of Daily Living Questionnaire for the period from May of 2004, through the date of the questionnaire. (Tr. 210-15). In general, plaintiff's activities were very similar to those reported in May of 2004, although plaintiff qualified her daily activities of house cleaning and yardwork with the notations "short interval" and "as tolerated." (Tr. 213). Plaintiff's also indicated that she was no longer able to mow the yard, vacuum or carry laundry or groceries. (Tr. 215).

## 5.    The ALJ's Consideration of the Medical Evidence

Plaintiff argues that the ALJ erred by rejecting the opinions of Dr. Erickson and Dr. Ebrahim. Plaintiff asserts that both opinions, which stated that plaintiff was unable to work due to her impairments, are supported by evidence in the record. Plaintiff also argues that the ALJ improperly rejected the opinions of Dr. Miller and Dr. Kirchner, and that the evidence in the record, post-decision, makes it impossible to conclude that substantial evidence supports the decision.

The opinion of a treating physician must generally be afforded substantial weight. Burress v. Apfel, 141 F.3d 875, 880 (8th Cir. 1998); see 20 C.F.R. § 404.1527(d).

Nevertheless, an opinion rendered by a claimant's treating physician is not necessarily conclusive.  Bentley v. Shalala, 52 F.3d 784, 785-86 (8th Cir. 1995).  When weighing a medical opinion, the ALJ should consider: 1) the examining relationship; 2) the treatment relationship; 3) whether medical findings support the opinion; 4) whether the opinion is consistent with the record as a whole; and 5) whether the physician is a specialist.  20 C.F.R. § 404.1527(d)(1)-(5); Brueggemann v. Barnhart, 348 F.3d 689, 694 (8th Cir. 2003).  An ALJ may discount a treating physician's medical opinion when the treating source's statements are conclusory or unsupported by medically acceptable clinical or diagnostic data.  Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996); Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir. 1991); Kirby v. Sullivan, 923 F.2d 1323, 1328 (8th Cir. 1991); Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986).  Moreover, an ALJ is not required to rely specifically on a physician's assessment of a claimant's RFC, but rather can determine the RFC "based on all the evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier, 294 F.3d at 1024 (quoting MacKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)); see also  20 C.F.R. § 404.1527(e).

In determining that plaintiff was not disabled and that she could perform sedentary work, the ALJ extensively discussed the medical record.  (Tr. 18-20, 23-30). The ALJ first noted that no treating or examining physician had offered an opinion regarding the possible listing level severity of claimant's impairments and that the state agency physicians had opined that plaintiff did not meet or medically equal the severity criteria of any listed impairment.  (Tr. 18).  Plaintiff does not contest this finding, and instead argues that the ALJ's RFC determination at step four is flawed.

The ALJ specifically noted the opinion letters of both Dr. Erickson and Dr. Ebrahim, but declined to accord them significant weight. (Tr. 25). With respect to Dr. Erickson's letter, the ALJ found that Dr. Erickson referenced impairments which were not objectively supported by the record at that time, and that there was no discussion of functional limitations in Dr. Erickson's treatment notes. (Tr. 25, 284). Consequently, the ALJ found Dr. Erickson's opinion to be conclusory. (Tr. 25). Similarly, with respect to Dr. Ebrahim's opinion letter, the ALJ noted that there was no description of specific work-related limitations, and that the opinion was conclusory and inconsistent with the evidence in the record as a whole. (Tr. 25-26, 294).

The ALJ then considered the opinion of Dr. Miller that plaintiff was "really incapable of gainful occupation due to serious physical ailments as well as her depression." (Tr. 28, 413). The ALJ noted that Dr. Miller had evaluated plaintiff only once at the time he had rendered his opinion, and that the opinion appeared to be primarily based on plaintiff's subjective complaints. (Tr. 28). The ALJ also found that to the extent Dr. Miller's opinion was based on plaintiff's mental health symptoms, it was outside his area of expertise as an orthopedist. (Tr. 28). Likewise, the ALJ rejected the opinion of Dr. Kirchner that plaintiff probably did not have the capacity to work independently or carry out work-like tasks with reasonable persistence or pace, because it appeared to be based primarily on plaintiff's subjective complaints and her physical impairments, which were outside Dr. Kirchner's area of expertise. (Tr. 29, 381).

Instead, the ALJ correctly placed significant weight on the opinions of Dr. Wiest and Dr. Lessard, both of whom not only were specialists in the areas of plaintiff's physical ailments, but had treating relationships with plaintiff. (Tr. 26-27). In this

40

regard, Dr. Wiest had opined in both May and December 2002 that plaintiff could consider sedentary type work, with limitations (i.e. one that involved frequent changes in sitting, standing and limited walking, and did not include any long-term sitting or standing, climbing, squatting or kneeling),[17] and in April 2003, Dr. Lessard had provided specific functional limitations which were consistent with a range of sedentary exertional work.  (Tr. 25-26, 279, 298, 352-53).[18]  The ALJ also based his RFC determination on

---

[17]    Of particular significance to this Court is the fact that in December 2002, plaintiff saw both Drs. Ebrahim and Weist for the purpose of obtaining a letter to support her disability claim.   (Tr. 298, 301).   On December 10, 2002, plaintiff reported to Dr. Ebrahim she could only sit for 10-15 minutes at a time, and then she had to get up and walk around, and that she could only stand for 10-15 minutes at a time before she had to sit down.  (Tr. 301).   Three days later, plaintiff saw Dr. Weist relative to her disability claim and informed him that she was unemployed because she was having difficulty with any standing, squatting or kneeling.   (Tr. 298).   Dr. Weist rejected plaintiff's claim that she could not work and indicated that she could perform sedentary type work with limited standing (less than an hour or so a day) and no climbing, squatting or kneeling.  (Tr. 298).

[18]    Plaintiff's suggestion that the functional limitations stated by Dr. Lessard are confusing and that the ALJ imposed his own interpretation on them, is rejected.   The relevant regulations define sedentary work as follows:

> [I]nvolves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).   Here, Dr. Lessard opined that plaintiff was subject to the following restrictions:

> She is not to stand, walk, or run for a period of greater than 15 minutes without a similar resting time.  She should not carry, lift, push, or pull any object heavier than 10 pounds, once, twice, or many.  She should refrain, if at all possible, from walking stairs or ladders, etc.   She should also refrain from any activity requiring her to squat down on her haunches or crawl down on her knees, etc., totally.   She may sit indefinitely, use her upper extremities, from what I can tell today, indefinitely without restrictions.

the fact that Dr. Johnson, the orthopedist who performed plaintiff's partial knee replacement in March 2005 had indicated 2 days after the hearing that plaintiff had obtained excellent results from her surgery and that her pain level was "almost zero", and that Dr. Mangiamele, who saw plaintiff the next day for her back pain, had found that plaintiff was in no overt discomfort and was without intractable pain or motor weakness.  (Tr. 28, 424, 429, 436).

In this case, the ALJ was presented with a wealth of medical opinions, some of which were contradictory on the ultimate determination as to whether plaintiff was capable of gainful employment.  In such a case, it was the duty of the ALJ to weigh the medical evidence and to make a determination based on the evidence of record.  See 20 C.F.R. § 404.1527(c) ("When there are inconsistencies in the evidence . . . we will make a determination or decision based on the evidence we have.").  After reviewing the record, the Court finds the ALJ properly discussed and provided specific reasons for rejecting the opinions of Dr. Erickson, Dr. Ebrahim, Dr. Miller and Dr. Kirchner, and for placing significant weight on the opinions of Drs. Weist and Lessard, all in accordance with the factors set forth in 20 C.F.R. § 404.1527(d).  See Dolph v. Barnhart, 308 F.3d 876, 878-79 (8th Cir. 2003) (quoting Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000)).

Additionally, plaintiff did not cite to, and this Court could not find, any functional limitations in the record which contradicted the limitations set forth in the RFC

(Tr. 352-53).  Not only does plaintiff fail to explain the ALJ's error in finding that Dr. Lessard's opinions supported his conclusion that she could perform sedentary work, but Dr. Lessard's functional limitations, although not a verbatim recitation of the language used in the regulation, conform closely to the functional requirements for sedentary work with the addition of certain positional limitations.

42

determination and which were ultimately incorporated by the ALJ into the hypothetical questions posed to the Vocational Expert.[19] (Tr. 32, 34, 512-16).

Finally, this Court finds that the RFC determination by the ALJ is supported by substantial evidence in the record as a whole. On May 10, 2002, Dr. Weist opined that were plaintiff to try a job, she would need one that involved frequent changes of position, namely sitting, standing and limited walking, and she would not be able to do long-term sitting and standing. (Tr. 279). On August 16, 2002, Dr. Ebrahim noted that plaintiff was taking Aleve for her arthritis and Paxil for mood swings, but that she had "no other medical problems." (Tr. 314). On August 28, 2002, Dr. Ebrahim noted that plaintiff's range of motion in her upper and lower extremities was within normal limits and equal bilaterally. (Tr. 313). On December 13, 2002, plaintiff saw Dr. Weist looking for support for her Social Security Disability claim. (Tr. 298). Instead of stating functional limitations consistent with disability, Dr. Weist indicated that he had strongly recommended that plaintiff only consider sedentary type work with limited standing (less than an hour or so a day) and no climbing, squatting or kneeling. (Tr. 298).

On April 29, 2003, Dr. Lessard opined that due to the degenerative disease in her left knee, plaintiff would need the following restrictions:

> She is not to stand, walk, or run for a period of greater than 15 minutes without a similar resting time. She should not carry, lift, push, or pull any object heavier than 10 pounds, once, twice, or many. She should refrain, if at all possible, from walking stairs or ladders, etc. She should also refrain from any activity requiring her to squat down on her haunches or crawl down on her knees, etc., totally. She may sit indefinitely, use her

---

[19] Aside from the first hypothetical, in which the ALJ asked the VE to assume that plaintiff's subjective complains were entirely credible, the VE testified that under each set of hypothetical functional limitations plaintiff would be able to perform a range of sedentary employment. (Tr. 512-19).

upper extremities, from what I can tell today, indefinitely without restrictions.

(Tr. 352-53).   On July 28, 2003, plaintiff told Dr. Ebrahim that Dr. Lessard's recommended treatment had taken care of her knee pain.  (Tr. 299).  Dr. Ebrahim also noted that plaintiff had applied for work in several grocery stores but had not heard back from them.  (Tr. 299).

In both January of 2002 and June of 2004, state agency physicians reviewed the medical record and opined that plaintiff was capable of a range of sedentary work. (Tr. 271-72, 368, 374).   On July 16, 2003, plaintiff saw Ms. Grover, a mental health specialist, who assigned a GAF score of 65, which indicated that plaintiff was experiencing only mild symptoms in her overall level of functioning.   (Tr. 339).   In August of 2003, plaintiff reported to Ms. Grover that Effexor had saved her marriage, and Ms. Grover observed that she appeared bright, engaged, happy and talkative, and that her mood was normal.  (Tr. 327).  On September 2, 2004, Dr. Kirchner evaluated plaintiff, finding that she was in partial to full remission for depression and that no other problems were discerned during the evaluation.  (Tr. 381).

On May 22, 2005, two days after the hearing, plaintiff saw Dr. Johnson for a follow-up visit for her partial knee surgery and reported that she was very pleased with the results and was almost pain-free.  (Tr. 429).  Dr. Johnson indicated that she had "excellent" results from the surgery.  (Tr. 429).  The next day plaintiff was examined by Dr. Magiamele for her low back pain.  Plaintiff did not exhibit any obvious discomfort, transferred from the interview chair to the exam table without difficulty, demonstrated the ability to stand on her toes and heels, and evaluation of her lumbosacral spine revealed no significant limitations with forward flexions.  (Tr. 436).  Dr. Mangiamele

opined that plaintiff was without evidence of intractable pain or motor weakness, stated she was not a candidate for surgical intervention, and placed no limitations on plaintiff's ability to function.   (Tr. 436).   Instead, he recommended continuation of physical therapy, including water exercises, and a weight loss program.  (Tr. 436).

Finally, plaintiff reported a level of daily activity consistent with a range of sedentary work.  Plaintiff reported that much of her day was spent doing household chores, albeit with tasks taking her longer than in the past, and that she was able to fulfill most adult living responsibilities without assistance.  (Tr. 198, 200, 210, 213, 379). Plaintiff also stated that she would vacuum, dust, pick up after family members, do dishes, cook, do laundry, do yard work, and go shopping.  (Tr. 198, 200, 213, 379).  In sum, substantial evidence on the record as a whole amply supports the ALJ's finding that plaintiff retained the capacity to perform a range of sedentary work.

Plaintiff also references the evidence obtained subsequent to the ALJ's decision. A plaintiff is permitted to submit additional evidence, if the evidence is new and material. 20 C.F.R. § 404.970(b); Browning v. Sullivan 958 F.2d 817, 822 (8th Cir. 1992).  A plaintiff must also demonstrate good cause for failing to incorporate the material in the proceedings before the ALJ.  See Woolf, 3 F.3d at 1215.  The Court's role in such situations is to determine whether the ALJ's decision is supported by the record as a whole, including the evidence submitted after the determination was made.  See Bergmann v. Apfel, 207 F.3d 1065, 1069 (8th Cir. 2000).  Such a role is peculiar on review, and requires the Court to consider how the ALJ would have weighed the new evidence had it existed at the hearing. See Id.; Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994).

The evidence obtained subsequent to the decision consists of a brief treatment note on August 5, 2005, by Dr. Johnson that plaintiff had a meniscal tear in her left knee and was given an injection, a lengthy note by Dr. Keashly on the same day in which he noted that Dr. Johnson saw no reason that plaintiff could not return to work and that previous workups on plaintiff had stated that her back was not as bad as she believed, and a consultative examination by Dr. Denis on August 15, 2005, where he indicated that plaintiff was limited in her ability to work in any gainful employment.  (Tr. 451, 462, 468).   This post-decision evidence is reflective of the record as a whole, i.e., it evidenced treatment for a specific symptom, an opinion that plaintiff was able to work, and an equivocal opinion that plaintiff was limited in her ability to work but unaccompanied by specific functional limitations.   Thus, the Court finds that the evidence obtained subsequent to the decision was not qualitatively different from the evidence available to the ALJ and would not have changed his decision regarding plaintiff's ability to work had it been available at the time of decision.  See Bergmann, 207 F.3d at 1069; Riley, 18 F.3d at 622.

6.   **Plaintiff's Subjective Complaints of Disability**

Failure to give some consideration to a claimant's subjective complaints is an error.  Brand, 623 F.2d at 526.  "[A] headache, back ache, or sprain may constitute a disabling impairment even though it may not be corroborated by an x-ray or some other objective finding."   Id.   An ALJ must consider a claimant's subjective complaints regardless of whether they are corroborated by objective medical findings.  Id.  The ALJ may not disregard a claimant's subjective complaints solely because he or she believes the objective medical evidence does not support them.   Griffon v. Bowen, 856 F.2d 1150, 1154 (8th Cir. 1988).

In considering a claimant's subjective complaints of disability, the ALJ must assess the claimant's credibility, applying the factors set forth in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984), *judgment vacated on other grounds sub nom.*, Bowen v. Polaski, 476 U.S. 1167 (1986).  The Polaski factors require the ALJ to give full consideration to al the evidence presented relating to subjective complaints, including prior work record, and observations of third parties and treating/examining physicians relating to such matters as:

1.     the claimant's daily activities;

2.     the duration, frequency, and intensity of the pain;

3.     precipitating and aggravating factors;

4.     dosage, effectiveness, and side effects of medication; and

5.     functional restrictions.

Id.

It is the ALJ's duty to decide questions of fact, including the credibility of a claimant's testimony.  See Nelson v. Sullivan, 96 F.2d 363, 366 (8th Cir. 1992).  Therefore, "[t]he ALJ may discount a claimant's allegations of pain when he explicitly finds them inconsistent with daily activities, lack of treatment, demeanor, and objective medical evidence."  Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996).  However, if the ALJ rejects a claimant's complaint of pain, "the ALJ must make an express credibility determination detailing his reasons for discrediting the testimony."  Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991).  "It is not enough that inconsistencies may be said to exist, the ALJ must set forth the inconsistencies in the evidence presented and discuss the factors set forth in Polaski when making credibility determinations."  Id.  If the ALJ explicitly discredits the claimant's testimony and gives a reasoned analysis, it is proper

to defer to the ALJ's determination.  See Russell v. Sullivan, 950 F.2d 542, 545 (8th Cir. 1991).

Plaintiff argues that the ALJ's analysis of her subjective complaints was flawed. Plaintiff acknowledges that the ALJ discussed some the Polaski factors, but nevertheless maintains that he did so based on "snapshots in time" as opposed to the record as a whole.

The ALJ acknowledged that plaintiff experienced symptoms and limitations associated with her impairments, but found that her subjective allegations of complete disability were inconsistent with the evidence of record.  (Tr. 30-31).  The ALJ found that plaintiff experienced intermittent exacerbations of back pain and other symptoms, but that plaintiff realized improvement of symptoms with treatment.  (Tr. 31).

The ALJ found that plaintiff's work history was neither a positive or negative factor, noting that plaintiff had realized only minimal earnings in the 10 years prior to her alleged onset date.  (Tr. 21).  The ALJ noted that normally such earnings would raise concerns about a claimant's motivation to perform full-time employment, but that in plaintiff's case she was the primary caregiver for her husband which limited her ability to engage in full-time employment.   (Tr. 21).   The ALJ also noted that plaintiff demonstrated the ability to perform part-time work as well as be a caregiver despite her knee pain, which reflected a greater capacity for full-time work activity than plaintiff claimed.  (Tr. 21).  The ALJ also noted that plaintiff had applied for jobs, which indicated that plaintiff believed she was capable of performing some type of work activity.

With respect to plaintiff's daily activities, the ALJ found that plaintiff had engaged in level of activity subsequent to her alleged onset date of disability that was inconsistent with her subjective complaints of total disability.  (Tr. 22).  The ALJ noted

that plaintiff had injured herself hunting in October of 2001, reported walking three or four times per week in May of 2002, had been out picking choke cherries in July of 2003, and that she maintained contact with her family and friends and was responsible for the care of her husband's adult children.  (Tr. 22, 280, 314, 319).  The ALJ also noted that plaintiff had reported that she was able to care for her personal needs and able to perform household chores.  (Tr. 22, 379).

The ALJ considered plaintiff's use of medications and compliance with therapeutic recommendations.  (Tr. 27, 30).  The ALJ indicated that plaintiff did not comply with Dr. Lessard's treatment, and that she generally used over-the-counter pain medication to control her symptoms.  (Tr. 27).  The ALJ found that plaintiff's complaints of medication-induced fatigue were unsupported as reflected by the fact that there were no reports of such fatigue in the medical record.  (Tr. 30).  The ALJ specifically noted that in August of 2003, plaintiff reported no side effects from taking Effexor.  (Tr. 30, 327).  Plaintiff asserts that the ALJ erred, and that the record does reflect her reports of medication-induced fatigue.  Plaintiff specifically points to Dr. Erickson's treatment note of September 17, 2001; Dr. Lessard's evaluation of April 29, 2003; and Dr. Kirchner's evaluation of September 2, 2004.  (Tr. 286, 347-53, 377-82).  Plaintiff's argument is without merit.  Dr. Erickson's treatment note states only that plaintiff "is not taking any prescription medication at this time[.]"  (Tr. 286).  Dr. Lessard's evaluation note contains a short list of her current medications and reflects that Dr. Lessard warned plaintiff not to mix NSAID drugs.  (Tr. 349, 352).  Dr. Kirchner's evaluation reflects plaintiff's report that "she does not tolerate pain medications well and [is] forced to use over-the-counter medications."  (Tr. 381-82).

Finally, the ALJ considered the frequency of plaintiff's treatment and the intensity and duration of her symptoms, finding them inconsistent with her allegations of complete disability. (Tr. 27, 31). The ALJ found that plaintiff only occasionally sought treatment for her symptoms and that they typically resolved relatively quickly with treatment. (Tr. 27, 31). The ALJ also noted that plaintiff had not sought or required regular and ongoing treatment. (Tr. 31). The ALJ found that the record supported the conclusion that plaintiff experienced symptoms at all relevant times, which were exacerbated intermittently and resolved with treatment. (Tr. 31).

The question the ALJ was tasked with answering is not whether plaintiff experienced pain, but whether plaintiff's subjective complaints prevent her from performing any type of work. See McGinnis v. Chater, 74 F.3d 873, 874 (8th Cir. 1996). It is the ALJ's duty to decide questions of fact, including the credibility of a claimant's testimony. See Nelson v. Sullivan, 96 F.2d 363, 366 (8th Cir. 1992). If the ALJ explicitly discredits the claimant's testimony and gives a reasoned analysis, it is proper to defer to the ALJ's determination. See Russell v. Sullivan, 950 F.2d 542, 545 (8th Cir. 1991). The question this Court must answer is not whether the record would have supported plaintiff's subjective complaints of total disability, but rather whether substantial evidence in the record as a whole supports the ALJ's determination. See 42 U.S.C. § 405(g); Murphy, 953 F.2d at 384. After considering the record, the Court cannot agree with plaintiff and say that the ALJ erred in finding plaintiff's subjective complaints less than credible. Mitchell, 25 F.3d at 714; see also Woolf, 3 F.3d at 1213. To the contrary, the ALJ specifically analyzed and compared plaintiff's subjective complaints with the evidence of record and gave detailed reasons for finding them inconsistent and not entirely credible. Thus, the Court finds that the ALJ properly

assessed plaintiff's subjective complaints according to the dictates of <u>Polaski</u> and expressly discounted aspects of plaintiff's subjective complaints of disability.

### 7.    The Hypothetical to the Vocational Expert

Plaintiff argues that the ALJ's ultimate determination that plaintiff retained the RFC for work which existed in significant numbers, was not valid because the ALJ failed to propound a proper hypothetical to the VE.  "Testimony from a VE based on a properly phrased hypothetical question constitutes substantial evidence." <u>Roe v. Chater</u>, 92 F.3d 672, 675 (8th Cir. 1996).  While a hypothetical must accurately set forth all of the claimant's impairments, the question need only include those limitations accepted by the ALJ as true.  <u>Rappaport v. Sullivan</u>, 942 F.2d 1320, 1323 (8th Cir. 1991).

Plaintiff argues that the ALJ failed to incorporate the mental health limitations of the consultative examiner and that the limitations put forth by Dr. Lessard were subject to alternate interpretation.  As the Court has explained above, the ALJ appropriately interpreted the opinion of Dr. Lessard and gave good reasons for rejecting the opinion of Dr. Kirchner.  As such, the Court concludes that the ALJ propounded a proper hypothetical to the ALJ, which was properly analyzed by the VE.  <u>See Roe</u>, 92 F.3d at 675.  In sum, the Court finds that substantial evidence on the record as a whole supports the ALJ's reasoned analysis and determination that plaintiff retained the RFC for work which existed in significant numbers.

VI.     **RECOMMENDATION**

For the reasons set forth above, it is **HEREBY RECOMMENDED** that:

1.      Plaintiff's Motion for Summary Judgment [Docket No. 16] be **DENIED**;

2.      Defendant's Motion for Summary Judgment [Docket No. 20] be **GRANTED**.


Dated:          August 14, 2007

                                        *s/ Janie S. Mayeron*
                                        JANIE S. MAYERON
                                        United States Magistrate Judge


Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before August 31, 2007 a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.